UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LINDA K. STONE, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | 11 C 7894 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant/Counter-Plaintiff/Third-Party Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| JACK L. STONE, RALPH BOGOT, BANK OF AMERICA, NA, DALE & GENSBURG, P.C., MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, FEDERAL HOME LOAN MORTGAGE CORPORATION, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

<u>MEMORANDUM OPINION AND ORDER</u>

In June 2011, the United States filed two Notices of Federal Tax Lien for the unpaid federal income tax liabilities of Jack L. Stone against a residential property ("Property") located in Highland Park, Illinois. The Notices listed "Linda Stone, as Nominee of Jack Stone," as the taxpayer. Linda K. Stone, Jack's spouse, then brought this suit against the United States, alleging that she is the Property's sole owner and seeking to quiet title thereto. Doc. 1. In response, the United States: (1) answered Linda's complaint; (2) asserted a third-party claim against Jack seeking to reduce to judgment the income tax assessments against him; (3) sought enforcement of the tax liens against the Property to satisfy Jack's tax liabilities; and (4) sought the right to sell the Property free and clear of all liens, with the net proceeds being allocated among the United States and Third Party-Defendants Federal Home Loan Mortgage Corporation

("Freddie Mac"), Dale & Gensburg, PC, Bank of America, N.A. ("BANA"), Ralph Bogot, and Mortgage Electronic Registration Systems Inc. ("MERS"), in accordance with their respective priorities. Doc. 43.

The court granted summary judgment to the United States against Jack, finding him liable in the amount of $246,748.54, plus interest and statutory additions accruing from and after January 22, 2013. Doc. 52. Dale & Gensburg and Bogot have defaulted. The United States, BANA, MERS, and Freddie Mac have stipulated to their respective priorities. Doc. 69.

Remaining for disposition is the dispute between Linda and the United States concerning who lawfully owns the Property—Linda says that she is the sole owner, while the United States says that Linda is Jack's nominee and therefore that Jack and Linda co-own the Property—and thus whether the United States may assert its lien against the Property to satisfy Jack's tax liability. The court conducted a bench trial on that question. Doc. 75-76. Pursuant to Federal Rule of Civil Procedure 52, the court enters the following findings of fact, which are found by a preponderance of the evidence, and conclusions of law. To the extent that any findings of fact may be considered conclusions of law, they shall be deemed conclusions of law, and to the extent that any conclusions of law may be considered findings of fact, they shall be deemed findings of fact. After considering the admissible evidence and the parties' stipulations, and upon assessing the witnesses' credibility, the court finds that Linda is not the Property's sole owner, that Linda and Jack co-own the Property, and therefore that the United States's lien is valid. This finding disposes of Linda's quiet title claim in favor of the United States. The court requests from the parties briefing on how the United States's lien should be enforced in light of Linda's interest in the Property and the interests of BANA, MERS, and Freddie Mac.

<h1 style="text-align:center">Findings of Fact</h1>

**A.      The Parties**

1.      Linda, born in 1949, and Jack, born in 1935, married in 1975 and remain married to this day.  Tr. 76:14 (07/01/13);[*] Doc. 57 at 6; Stipulations 1, 4–5.

2.      At the time of trial, Jack was 77 years old and suffered from Addison's Disease, high cholesterol, and a seizure disorder.  Tr. 4:1, 5:24–6:1 (07/02/13).  One medication Jack was taking at the time of trial affects his memory.  Tr. 6:22–7:3 (07/02/13).

3.      The Stones had two children together, Jennifer and Liza, who now are in their mid-thirties.  Tr. 77:1–3 (07/01/13); Tr. 5:12–15 (07/02/13); Stipulation 7.

4.      Jack has two children from a prior marriage, both now in their fifties.  Tr. 5:1–11 (07/02/13); Tr. 77:4–8 (07/01/13); Stipulation 6.

5.      Linda had been a school teacher, but she did not work outside the home between the time she married Jack until about 1992 or 1993.  Tr. 76:3–7 (07/01/13).

6.      Linda had her own source of personal wealth as a beneficiary of her uncle's trust.  Tr. 84:3–5 (07/01/13); Stipulation 9.  She received the first distribution from this trust in 1981, and received two more distributions five and ten years later, the proceeds of which she invested.  Tr. 84:3–85:2 (07/01/13); Stipulation 11; Pl. Exhs. 9, 14.

7.      Linda kept her own personal checking account, and she and Jack had a joint account that they used to pay bills.  Tr. 77:22–78:19 (07/01/13).

8.      Jack has been an insurance salesman since 1971.  Tr. 3:16–24 (07/02/13).

9.      Until 1992, Jack had his own insurance sales company, Omni Insurance Consultants.  Tr. 14:24–15:1 (07/02/13).

---

[*] Because the parties did not order an official transcript, the court cites to the pagination in the unedited "realtime" files created by the court reporter during trial.  If an official transcript is prepared, its pagination will be slightly different than the "realtime" pagination.

**B.     The Property**

10.     On August 5, 1977, Linda and Jack were granted a deed to the Property in joint tenancy.  Def. Exh. 2.

11.     Linda and Jack bought the Property for $179,000, using $79,900 that Jack had inherited from his father and $100,000 from a mortgage loan.  Tr. 121:10–13 (07/01/13); Stipulation 3.

12.     Linda and Jack moved into the Property in January 1978.  Tr. 86:24–25 (07/01/13); Stipulation 3.  They both have lived at the Property ever since.  Tr. 75:16–19 (07/01/13); Tr. 2:11–14 (07/02/13); Stipulation 2.

13.     On November 11, 1992, Jack executed a quitclaim deed purporting to convey his interest in the Property to Linda for the "consideration of [$10] and other good and valuable consideration."  Def. Exh. 3; Pl. Exh. 11.

14.     At the time of the conveyance, Jennifer and Liza were teenagers.  Tr. 5:16–20 (07/02/13).

15.     The quitclaim deed was recorded by the Lake County Recorder of Deeds on April 20, 1993.  Def. Exh. 3.

**C.     Facts Pertaining to the Alleged Consideration for Jack's Execution of the Quitclaim Deed**

16.     Jack testified that part of the reason for his making the quitclaim deed was to forgive debts that he had incurred to Linda before 1992.  Tr. 12:14–13:8 (07/02/13).

17.      Up through 1992, Jack made almost all of the mortgage payments for the Property, which were about $775 per month initially, and he also paid the utility bills, all insurance premiums and property taxes, and more than half of the landscaping costs.  Tr. 123:5–124:18 (07/01/13).  Based on the figures presented at trial, the court conservatively estimates that

in addition to the $79,000 paid towards the original purchase of the Property, Jack expended over $350,000.00 in mortgage, utility, insurance, and property tax payments from 1977 through November 1992.

18.     From the time the house was purchased until 1992, Linda made a handful of mortgage payments, totaling around $7,000.  Tr. 124:19–25 (07/01/13).

19.     Before 1992, Linda paid for several improvements to the Property, including rehabbing the family room, installing a stone fireplace and a bar, remodeling the kitchen, buying furniture, painting, carpeting, marble work, and a remodeling the powder room.  Tr. 89:1–11 (07/01/13); Tr. 19:13–16 (07/02/13).  Linda estimated that the kitchen remodeling cost approximately $40,000, but she could not recall how much she spent on the other improvements. Tr. 87:24–88:2 (07/01/13).

20.     Linda provided a summary chart detailing the household expenses and improvements for which she paid from her own funds.  Pl. Exh. 2.  The chart begins in 1992. *Ibid*.  The only entries that preceded the quitclaim deed are for drapery, plumbing, legal services, auto work, and carpet cleaning, and total $3,344.30.  *Ibid*.

21.     At trial, Linda testified that she considered Jack's conveyance to her of his interest in the Property as partial repayment for improvements to the Property for which she had paid.  Tr. 117:14–18 (07/01/13).  However, at her deposition, Linda testified that she did not consider the pre-1992 improvements for which she paid to be loans to Jack.  Tr. 127:8–16 (07/01/13).  Given this discrepancy between her deposition and trial testimony, the court does not credit Linda's trial testimony on this subject.  Linda's trial testimony that her pre-quitclaim deed contributions to the Property required repayment from Jack is also not worthy of credit because, prior to the quitclaim deed and as compared to Linda, Jack had paid the lion's share of

the total costs incurred for the purchase price, mortgage payments, utility bills, insurance premiums, property taxes, and landscaping for the Property.

22.     Another summary chart prepared by Linda details payments made by Linda on Jack's behalf; the entries list payments from 1988-2008, and total $89,596.67.  Pl. Exh. 1.  Check registers accompany the chart.

23.     Linda testified that when she made the payments to Jack reflected on that chart, she considered them to be loans.  Tr. 97:16–24 (07/01/13).  Only two items on that chart predate the quitclaim deed: $4,590 in 1988, and $5,404 on April 10, 1989.  Pl. Exh. 1.

24.     For the $4,590 amount in 1988, the check register says, "Jack—(for 1987 tax)." Pl. Exh. 1 (LS_3380); Tr. 142:7–22 (07/01/13).  At trial, Linda initially testified that this was a loan for Jack's taxes; when reminded that they had filed joint returns at that time, Linda conceded, "It was for taxes.  It wasn't a loan.  It was for taxes."  Tr. 142:16–22 (07/01/13).

25.      For the $5,404 amount in 1989, the check register says, "Jack (for 88 taxes)." Pl. Exh. 1 (LS_03882).  Again, when pressed on cross-examination, Linda testified "that must have been my portion of taxes for that year."  Tr. 142:23–143:5 (07/01/13).

26.     According to Linda's own testimony, then, the only two pre-quitclaim deed entries on that chart did not, in fact, reflect loans to Jack.

27.     Linda testified that she kept "[v]ery good accounting" for her own personal records.  Tr. 91:9–11 (07/01/13).  She also admitted that the only way she would remember the purpose of an entry in her check register would be from her own contemporaneous notations on the register.  Tr. 146:24–147:5 (07/01/13).

28.     There are several post-quitclaim deed items on that chart that the check register does explicitly designate as loans.  One item is a check written to Jack on June 28, 1996, in the

amount of $6,788.78, designated in the check register as "Jack Stone loan." Tr. 141:13–18 (07/01/13). Another item is a check written to Jack for $15,000 on October 8, 1993, designated in the check register as "Jack—loan to be repaid." Pl. Exh. 1 (LS_03788). Another item is a $10,000 check to Jack on August 14, 1996, designated in the check register as "Jack Stone LOAN." Tr. 144:20–22 (07/01/13); Pl. Exh. 1 (LS _02216). Another item is a check to Jack for $759 on August 27, 1996, designated in the check register as "IRS LOAN TO JACK." Tr. 144:23–145:14 (07/01/13); Pl. Exh. 1 (LS_02216).

29. Given Linda's testimony that she keeps very good records, and given that she expressly indicated in the above-referenced check register entries that certain checks written to Jack were loans, the court finds that the only actual loans from Linda to Jack reflected on that summary chart are those designated as loans on the check register. The fact that Linda indicated that a relatively minor check for $759 was a loan further confirms this finding.

30. Another summary chart reflects "expenses for daughters" that Linda paid from her personal funds. Pl. Exh. 3. The expenses were incurred from August 1994 through April 2002, and thus could not have been "loans" paid off by Jack with the November 1992 quitclaim deed.

31. Another summary chart reflects wedding expenses that Linda paid from her personal funds. Pl. Exh. 5. The expenses were incurred from 2001–2004, and thus could not have been "loans" paid off by Jack with the November 1992 quitclaim deed.

32. Another summary chart reflects credit card expenses that Linda paid from her personal funds. Pl. Exh. 6. The expenses were incurred from 2004–2009, and thus could not have been "loans" paid off by Jack with the November 1992 quitclaim deed.

33.     Another summary chart is titled "Linda Stone's Payments for Income Taxes, IRS and Accountant Expenses." Pl. Exh. 4. This chart indicates that on May 31, 1990, and December 21, 1990, respectively, Linda wrote checks for Jack's taxes—the first for $15,362 to the IRS, and the second for $60,000 to Jack.

34.     The check register entry for the $60,000 check reads "Jack Stone (my 1st pymt)." Pl. Exh. 4 (LS_03384). The check register entry for the $15,362 check reads "IRS (JACK OWES ME THIS FOR 90 TAXES)." *Ibid*. When asked about these entries on cross-examination, Linda testified, "To the best of my knowledge, if I made a notation like that, it was that Jack owed me $15,362 for his taxes, and I paid him—I paid $60,000 for my taxes?" Tr. 143:19–25 (07/01/13). And with respect to the $60,000 check, Linda explained: "That must have been when I received payment from the exchange bank." Tr. 144:2–3 (07/01/13).

35.     The court finds that the $15,362 was indeed a loan from Linda to Jack because it was noted on the check register as such. By contrast, the court finds the $60,000 was not a loan because the check register does not designate it as a loan and, equally significant, Linda testified that amount was for her own taxes arising from a "payment" she had received in 1990. That "payment" likely reflected monies from Linda's inheritance from her uncle. Tr. 137:20–138:14 (07/01/2013); Def. Exh. 87 at 1; *see also* Tr. 84:5–8 (07/01/2013) (Linda testifying that she invested money from that inheritance with "the exchange bank and made a large return on that investment 10 years later").

36.     On December 31, 1992, about seven weeks after Jack made the quitclaim deed, Linda and Jack entered into an installment note and security agreement, under which Linda loaned Jack $50,000, to be repaid in installments of $500 per month, with the loan secured by

stock owned by Jack. Pl. Exh. 7. Linda testified that she hired a lawyer to help her with this agreement because she wanted to ensure repayment. Tr. 139:5–8 (07/01/13).

37.     This loan was repaid in its entirety. Tr. 139:9–11 (07/01/13).

38.     Linda did not introduce into evidence any loan agreements for the other payments from her personal funds that she now claims were loans to Jack. Linda testified at her deposition that no loan agreements were prepared for any such payments before 1993, and that those payments were "part of [their] marital living. If [she] could help, [she] could help, but there were no formal agreements." Tr. 140:6–15 (07/01/2013).

39.     Linda also testified at trial that Omni (Jack's insurance business) made several deposits into her personal checking account, which she indicated were "repayment for something." Tr. 150:22–152:17. In October 1992, there were four deposits from Omni into Linda's personal checking account in the amount of $4,000, $3,891.13, $346.60, and $1,500. Pl. Exh. 9 (LS_2196-2197). On October 28, 1992, there was another deposit from Omni in the amount of $1,500. Pl. Exh. [9 or 14] (LS_2197). Between November 2 and November 9, 1992, there were deposits from Omni into Linda's account in the amounts of $1,000, $2,000, and $4,000. Pl. Exh. [9 or 14] (LS_2198).

40.     Linda and Jack did not have the Property appraised before the quitclaim deed was made. Tr. 128:5–7 (07/01/13). At her deposition, Linda testified to her view that the Property was worth $700,000 at the time. Tr. 111:10–17 (07/01/13). At trial, Linda testified that the Property was worth $400,000 at the time. Tr. 128:5–7 (07/01/13).

41.     Linda and Jack did not prepare a document indicating which loans would have been paid off by Jack's making of the quitclaim deed. When asked whether Jack owed her less

money after the quitclaim deed, Linda testified vaguely that "it would have been taken into consideration." Tr. 128:16–24.

42.     The court finds that Jack had no outstanding debt to Linda at the time of the quitclaim deed. Only one of the payments from Linda to Jack before November 11, 1992, was actually a loan; that was the $15,362 transferred on May 30, 1990. However, in 1992, Jack's business made $16,737.73 in deposits into Linda's account, which Linda admitted were repayments. In addition, as noted above, prior to making the quitclaim deed, Jack had paid the lion's share of the total costs incurred for the purchase price, mortgage payments, utility bills, insurance premiums, and property taxes for the Property. Jack's contributions in this regard far exceeded Linda's personal contributions to the Property.

43.     Thus, the court finds that the quitclaim deed of November 11, 1992, could not possibly have been for the purpose of satisfying any debt that Jack owed to Linda, as the evidence does not show that any debt was owed at that time. (The same finding would be made even if the $60,000 check had been a loan from Linda to Jack, as Jack's contributions to the Property exceeded Linda's by far more than $60,000.) This conclusion is confirmed by the fact that Linda and Jack did not prepare a document indicating which existing debts were paid off by Jack's making the quitclaim deed. As demonstrated by the installment note they made seven weeks later, Linda and Jack certainly knew how to document loan transactions, and the fact that they did not document Jack's "repayment" of his "debt" to Linda (scare quotes intended) speaks volumes.

### D.     Other Facts Relating to the Purpose of the Quitclaim Deed

44.     Linda testified that she and Jack executed the quitclaim deed for another reason: "There was a great deal of marital problems at the time. … [Linda] had loaned Jack a lot of

money, and [Linda] had paid for most of the major expenses in the house, maintenance and updates [and improvements]." She added: "Jack had two children by a previous marriage, and [Linda] wanted [her] children to be protected at all times. In the case of [her] death, [she] wanted the house to be for [her] children and not for Jack's children from his first marriage." Tr. 79:16–80:3, 117:15–18 (07/01/13).

45. Linda also testified that it was her intent to divorce Jack if he would not transfer the Property to her. Tr. 169:12–17 (07/01/13).

46. Linda did not consult an attorney to determine what she had to do to protect herself in the event of a divorce. Tr. 170:2–5 (07/01/13).

47. Jack testified almost identically on the reasons for making the quitclaim deed, but he could not remember if Linda had threatened to divorce him if he refused to sign it. Tr. 10:15–11:18 (07/02/13). Jack could not remember how much money Linda had lent him before he made the quitclaim deed, the number of occasions on which she had lent him money, or what loans remained due and owing at the time of the quitclaim deed. Tr. 11:19–12:13 (07/02/13).

48. Jack testified that, at the time of the quitclaim deed, he was not aware that creditors either had attempted or could attempt to collect debts owed by him or Omni. Tr. 17:12–15 (07/02/13).

49. Linda testified that she unaware at the time of the quitclaim deed of any creditors pursuing Jack, and that she also was unaware of any lawsuits that had been filed against Jack or that were going to be filed against him at that time. Tr. 80:4–12 (07/01/13).

50. Linda and Jack testified that they did not enter into the quitclaim deed to shield Jack's interest in the Property from creditors. Tr. 117:19–118:4 (07/01/13); Tr. 18:21–19:1 (07/02/13).

51.     For the following reasons, the court finds that: (1) at the time the quitclaim deed was made, Jack was aware that he and/or Omni had liabilities and potential liabilities and that creditors and potential creditors soon would be trying to collect on those liabilities, and (2) part of the reason for the quitclaim deed's making was to protect the Property from those creditors.

52.     In 1992, Jack decided to stop doing business as Omni and to move to a larger firm because "[s]mall insurance agencies were falling by the wayside." Tr. 14:14–16 (07/02/13).

53.     Linda knew that Jack was having trouble paying Omni's bills because, according to her, she had loaned him money around the time of the quitclaim deed. Tr. 167:3–11 (07/01/13). On October 16, 1992, Linda wrote Jack a check for $2,500 for an attorney named Adelman. Tr. 167:12–168:1 (07/01/2013).

54.     Linda also knew that Jack was closing Omni in 1992. Tr. 31:15–17 (07/02/13).

55.     Jack had between $50,000 and $150,000 in business debts in 1992. Tr. 31:2–14 (07/02/13).

56.     Jack was questioned at trial about five lawsuits that were filed against Jack and/or Omni in the 1990s. Jack had no recollection of those lawsuits, though he did recognize the name of Norman Hafron as his attorney at the time. Tr. 33:6–9 (07/02/13).

57.     The first lawsuit stemmed from a policy issued by Scottish Guarantee Insurance Co. to Ralph Bogot with a coverage period between July 11, 1989, and January 11, 1990. Def. Exh. 81 at 150-51. Bogot sued Jack and Omni (among others) for Scottish's failure to pay a $225,000 loss incurred on January 14, 1990. *Id*. at 33-34. Although the record includes a complaint dated January 13, 1995, in a case with a 1995 case number, *ibid*., the record also includes an order in a case brought by Bogot against Scottish, Omni, and others with a 1990 case number, *id*. at 418-419. The order, dated January 18, 1995, was for a default judgment against

Scottish.  *Ibid.*  It would appear that the 1995 case was for all practical purposes a continuation of the 1990 litigation against some of the original defendants (including Omni) and some new defendants (including Stone).

58.     The Rosenfeld Rotenberg firm appeared for Jack and Omni in the 1995 case.  *Id.* at 71.  On July 29, 1997, a default judgment was entered against Jack in the 1995 case in the amount of $225,000.  *Id.* at 482.

59.     In the second lawsuit, filed on June 23, 1992, Hallmark Personnel sued Omni, alleging failure to pay a $2,400 placement fee for an employee placed by Hallmark in January 1992.  Def. Exh. 82 at 1, 5-6.  The Rosenfeld Rotenberg firm appeared for Omni on July 8, 1992. *Id.* at 11.  The case was dismissed pursuant to settlement on January 20, 1993.  *Id.* at 15.

60.     The third suit involved a November 1990 loan agreement in which Jack borrowed about $46,000 from Continental Casualty Company.  Def. Exh. 83 at 13.  The loan was refinanced on November 1, 1991.  *Ibid.*  Jack testified that the loan agreement was for a computer system and not for money, Tr. 37:5 (07/02/13), but because Jack recalled nothing else about this loan, his testimony on this point will not be credited.

61.     On May 16, 1994, Continental Casualty sued Omni and Jack for breach of contract, alleging that $32,567.92 remained due on the loan.  Def. Exh. 83 at 11-12.  An arbitration award was entered against Jack on January 8, 1996, for $30,957.51.  *Id.* at 114.

62.     The fourth lawsuit, for unpaid legal fees, was brought in November 1995 against Jack and Omni by the Rotenberg Rosenfeld firm.  Def. Exh. 84.  After a default judgment was entered against him, Jack sent a letter to his prior firm, indicating that he had been in the courtroom and therefore could not understand how the default was entered.  *Id.* at 23; Tr. 38:21– 39:3 (07/02/13).

63.     The fifth lawsuit concerned a consent order dated October 25, 1991, between Jack

and the Illinois Department of Insurance.  The consent order arose from the Department's

allegation that Jack had violated certain duties as a licensed insurance broker.  Def. Exh. 85 at 9-

10.  The consent order required Jack to prove that he paid $68,900.95 to Indiana Insurance

Company within thirty days of the order's entry.  *Id*. at 12.  A violation of the order could have

resulted in the suspension of Jack's insurance license.  *Id*. at 13.

64.     On June 4, 1996, Indiana Insurance sued Jack, alleging that he had not paid

$29,382.73 of the amounts due.  *Id*. at 5.  That case settled shortly thereafter.  *Id*. at 29-31.

65.     In sum, although three of the five suits against Jack and/or Omni were filed after

Jack made the quitclaim deed on November 9, 1992, much of Jack's and Omni's liabilities or

potential liabilities—the Bogot insurance loss, the initial Bogot suit against Omni, the Hallmark

placement fee, the legal fees owed to Rosenfeld Rotenberg in the Hallmark case, the $46,655

loan from Continental Casualty, and the $68,900 obligation to Indiana Insurance Company—

arose before that date.  At the very least, Jack undoubtedly was aware in November 1992 of the

first Bogot suit, the loan from Continental Casualty, and the payment obligation to Indiana

Insurance Company; the Bogot suit and the Continental Casualty and Indiana Insurance

obligations arose in the two or so years preceding the quitclaim deed, and the Indiana Insurance

Company obligation had been reflected in a consent order with the regulatory agency that had

power over his insurance license.

66.     Linda testified that, at some point after the IRS assessed tax liabilities against

Jack, she held money in her account for him because there the government had placed a levy on

his bank accounts.  Tr. 155:21–156:7 (07/01/13).

67.     While the court understands that Jack may have been suffering from some memory loss during trial, the fact that he stated affirmatively that was unaware of looming creditors in 1992, the year he closed Omni, calls his credibility into serious question.  It is implausible that Jack would (purportedly) recall why he made the quitclaim deed in November 1992, but would not recall the financial pressures he was under at the time, especially given that failure to make good on the Indiana Insurance obligation could have resulted in the loss of his insurance license.

68.     The court finds that, as of November 1992, Jack was under a great deal of financial pressure arising from the closing of his business and the debts he owed to various creditors.  Furthermore, the fact that Linda admitted that, years later, she held money for Jack in her account to protect it from the federal tax levies on Jack's account indicates that she engages in and may not understand the impropriety of such shielding.

69.     In sum, the court finds that Jack made the quitclaim deed to protect the Property from Jack's and Omni's creditors and potential creditors at the time.

**E.     Facts Pertaining to Jack's "Dominion and Control" over the Property After Making the Quitclaim Deed**

70.     Between November 1992 and 2010 or 2011, Jack continued to make most of the mortgage, property tax, and insurance payments on the Property, while Linda continued to pay from her own personal funds for other household expenses such as capital improvements and maintenance.  Tr. 114:11–15, 129:1–5 (07/01/13); Tr. 20:14–21:22 (07/02/13); Pl. Exh. 2.

71.     During that time period. Linda made the decisions about improvements to the home, such as hiring contractors and decorating.  Tr. 90:17–91:4 (07/01/13).

72.     Jack continued to live at the Property during that time period, and Linda did not charge Jack rent.  Tr. 128:25–129:1 (07/01/13).

73.     Linda and Jack never separated at any point, and Linda never placed any restrictions on Jack's use of the home.  Tr. 177:25–178:8 (07/01/13).

74.     On November 12, 1998, Linda and Jack obtained a refinancing loan on the Property to pay off the earlier mortgage, and took out an additional $100,000 in equity.  Tr. 129:20–130:11 (07/01/13); Def. Exh. 6.  Linda testified and averred that she asked Jack to be a "co-signer" on the refinancing loan because she had insufficient income.  Tr. 129:20–130:11 (07/01/13); Def. Exh. 76 at ¶ 10.  However, the mortgage agreement states: "The mortgagor is Linda K. Stone and Jack L. Stone, wife and husband ('Borrower')."  Def. Exh. 6 at 1.

75.     Given these facts, the court finds that nothing about Linda's and Jack's respective dominion and control over the Property changed after the quitclaim deed was made—both of them continued to use the premises, and to contribute to it, in much the same ways they had before November 1992.

**F.     Notice of Federal Tax Liens**

76.     Jack has outstanding federal tax liabilities for several tax years between 2000 and 2008.  Doc. 52; Doc. 57 at 6; Stipulation 15.

77.     In late June 2011, the IRS filed two Notices of Federal Tax Lien against the Property for Jack's unpaid taxes.  Pl. Exh. 10; Stipulation 14.  Both Notices list the taxpayer as: "Linda Stone, as Nominee of Jack Stone."

78.     IRS Agent Lawrence Kagan testified that, although Jack's name no longer was on the deed, he considered Linda to be holding Jack's interest in the Property as a "nominee."  Kagan said that his conclusion in this regard took account of "various things.  First I look at title.  I look at consideration.  I look at the taxpayer's statements.  In this case, Jack told me it was his

house. … I looked at the collection information statements[.] … I looked if he still had full use, benefits, and still lived at the house." Tr. 54:25–55:17 (07/01/13).

## Conclusions of Law

In her quiet title action against the United States, Linda seeks a declaration that the nominee liens are invalid. Doc. 1 at ¶¶ 14, 23. "[A] suit to quiet title is functionally a form of declaratory-judgment action …." *Samuel C. Johnson 1988 Trust v. Bayfield Cnty.*, 649 F.3d 799, 801 (7th Cir. 2011). In its counterclaim, the United States asks the court to enforce the liens on the Property pursuant to 26 U.S.C. § 7403. Doc. 43 at ¶ 69. The validity of the liens is central to both claims. The United States argues that the liens are valid under a "nominee" theory and a "lien-tracing" theory. Because the nominee theory has merit, the lien-tracing theory need not be addressed.

Generally speaking, "to satisfy a tax deficiency, the Government may impose a lien [under 26 U.S.C. § 6321] on any 'property' or 'rights to property' [real or personal] belonging to the taxpayer." *Drye v. United States*, 528 U.S. 49, 55 (1999); *see also United States v. Craft*, 535 U.S. 274, 276 (2002). To determine whether a federal tax lien attaches to a particular property, the court must "look initially to state law to determine what rights the taxpayer has in the property the Government seeks to reach, then to federal law to determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of the federal tax lien legislation." *Craft*, 535 U.S. at 278 (quoting *Drye*, 528 U.S. at 58); *see also United States v. Swan*, 467 F.3d 655, 656 (7th Cir. 2006).

Linda and Jack bought the Property in 1977 as joint tenants. FOF ¶ 10. Under Illinois law, a joint tenancy is defined by "the four unities which are fundamental to both the creation and the perpetuation of the joint tenancy. These are the unities of interest, title, time, and

possession." *Harms v. Sprague*, 473 N.E.2d 930, 932 (Ill. 1984). Joint tenancies convey the

following rights:

> A joint tenancy is a present estate in all the joint tenants, with each joint tenant
> being "'seized of the whole.'" *Harms v. Sprague,* 105 Ill.2d 215, 224 (1984)
> (quoting *Partridge v. Berliner,* 325 Ill. 253, 257 (1927)). Like other property
> owners, a joint tenant may convey his or her interest in the property without
> the knowledge or consent of the other joint tenant, thereby severing the joint
> tenancy. *Sathoff v. Sutterer,* 373 Ill. App. 3d 795, 797 (2007). An inherent
> feature of a joint tenancy is the right of survivorship, which is the right of the
> last surviving joint tenant to take the whole of the estate. *Id.* The surviving
> joint tenant does not take the share of the deceased joint tenant as a successor,
> but by rights under the conveyance that created the joint tenancy.

*Snyder v. Heidelberger*, 953 N.E.2d 415, 420 (Ill. 2011).

On November 11, 1992, Jack purported to convey his interest in the Property to Linda by

making the quitclaim deed. FOF ¶ 13. If the conveyance was valid, this would have severed the

joint tenancy. *See Harms*, 473 N.E.2d at 932 ("The voluntary … destruction of any of the unities

by one of the joint tenants will sever the joint tenancy."). This in turn would mean that Jack has

no interest in the Property to which the United States could attach a tax lien. *See United States v.*

*Towne*, 406 F. Supp. 2d 928, 935 (N.D. Ill. 2005) ("[T]he record does not support a finding that

the Townes had any rights to the Property based on Illinois law. In other words, because Illinois

law does not recognize any interest described by the Government as 'property' or 'rights to

property,' the Taxpayers did not have any state-delineated property rights to which the relevant

federal tax liens could attach."), *aff'd sub nom.*, *United States v. Swan*, 467 F.3d 655 (7th Cir.

2006).

The United States contends, however, that the quitclaim did not validly transfer to Linda

Jack's interest in the Property and that, instead, Linda maintains Jack's interest as his "nominee."

An individual is a taxpayer's nominee when "the taxpayer has engaged in a legal fiction by

placing legal title to property in the hands of [that individual] while actually retaining some or all

of the benefits of true ownership." *Holman v. United States*, 505 F.3d 1060, 1065 (10th Cir. 2007). "The lien that arises after a taxpayer fails to pay an assessed tax liability attaches not only to property belonging to the taxpayer, but also to property held by the taxpayer's nominees—someone who has legal title when, in substance, the taxpayer enjoys the benefits of ownership." *United States v. Wesselman*, 406 F. App'x 64, 65 (7th Cir. 2010) (citing *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350-51 (1977); *Swan*, 467 F.3d at 658; *Macklin v. United States*, 300 F.3d 814, 818 n.2 (7th Cir. 2002)); *see also Fourth Investment LP v. United States*, 720 F.3d 1058, 1066 (9th Cir. 2013) ("The Supreme Court has interpreted section 6321 to apply to all property of a taxpayer, including property that is held by a third party as the taxpayer's nominee or alter ego.") (citing *G.M. Leasing*, 429 U.S. at 350-51). Accordingly, if Linda is Jack's nominee, the tax lien attaches to the Property.

Illinois state courts have not specifically addressed the nominee theory. In the absence of specific guidance from Illinois law, federal courts use a multi-factor standard to determine whether an individual is a delinquent taxpayer's nominee. *See United States v. Cohen*, 930 F. Supp. 2d 962, 979 (C.D. Ill. 2013); *United States v. N. States Investments, Inc.*, 670 F. Supp. 2d 778, 788-89 (N.D. Ill. 2009); *Towne*, 406 F. Supp. 2d at 937 n.2 ("The parties do not cite Illinois law when discussing the Government's nominee theory. In addition, Court finds no guidance from the Illinois courts concerning the nominee theory …."); *see also Swan*, 467 F.3d at 656, 658 (noting that "there do not appear to be any relevant differences between state and federal law" regarding the nominee theory) (citing *G.M. Leasing*, 429 U.S. at 351; *Scoville v. United States*, 250 F.3d 1198, 1202-03 (8th Cir. 2001); *Oxford Capital Corp. v. United States*, 211 F.3d 280, 282-86 (5th Cir. 2000)). The applicable standard provides as follows:

> Whether a titleholder is a nominee depends on the facts and circumstances of each case, including whether: (1) a close personal relationship exists between

the nominee and the transferor; (2) the nominee paid little or no consideration for the property; (3) the parties placed the property in the name of the nominee in anticipation of collection activity; (4) the parties did not record the conveyance; and (5) the transferor continues to exercise dominion and control over property. *See United States v. Schaut*, 2001 WL 1665314, at *3, 89 A.F.T.R.2d 2002-309 (N.D. Ill. Dec. 28, 2001); *United States v. McCullough*, 1994 WL 374471, at *3 (S.D. Ill. May [17,] 1994).

*Towne*, 406 F. Supp. 2d at 937; *see also May v. United States*, 2007 WL 3287513, at *3 (11th Cir. Nov. 8, 2007); *Oxford Capital Corp.*, 211 F.3d at 284 n.1; *United States v. Wesselman*, 2010 WL 1654899, at *3-4 (S.D. Ill. Apr. 22, 2010), *aff'd*, 406 F. App'x 64 (7th Cir. 2010); *N. States Investments, Inc*, 670 F. Supp. 2d at 788-89; *Frese v. Smith*, 1999 WL 1251856, at *3 (C.D. Ill. Nov. 5, 1999).

Although Linda's proposed conclusions of law recite the *Towne* factors, Doc. 58 at 5-6, Linda's closing argument at trial urged the court to rely on the factors set forth in *Fourth Investment LP v. United States*, *supra*. Tr. 87:14–88:12 (07/02/13). There is no meaningful difference between the factors in *Towne* and those in *Fourth Investment*. The one distinction concerns form, not substance, as the Ninth Circuit separates the "dominion and control" factor from *Towne* into two factors, "whether the transferor retained possession" and "whether the transferor continues to enjoy the benefits of the transferred property." 720 F.3d at 1069 n.6. The court will address the *Towne* factors in turn, taking into account the gloss placed by the Ninth Circuit on the "dominion and control" factor.

*First*, a close personal relationship existed between the nominee (Linda) and the transferor (Jack) at the time of the quitclaim deed. Linda and Jack were a married couple who were co-habiting with two minor children. FOF ¶ 14. Although there was some marital discord, FOF ¶¶ 41-44, they never separated and neither moved out of the Property, FOF ¶ 67.

*Second*, Linda paid little or no consideration for Jack's interest in the Property. Linda maintains that Jack made the quitclaim deed in November 1992 to repay his debts to her. As detailed above, however, Jack did not owe Linda any debts as of that date, which means that Linda paid Jack only $10 for his interest in the Property. FOF ¶¶ 16-43.

*Third*, as detailed above, Jack made the quitclaim deed to protect Jack's interest in the Property from existing and potential creditors. FOF ¶¶ 48-69.

*Fourth*, the parties recorded the quitclaim deed. FOF ¶ 15.

*Fifth*, from November 1992 through the present, Jack has continued to exercise dominion and control over the Property—that is, he has retained possession of the Property and has continued to enjoy the benefits thereof. As detailed above, Jack never moved out; he does not pay rent to live there; he continued to make mortgage, property tax, and insurance payments at least through 2010; he held himself out as the Property's owner for the purposes of obtaining the refinancing mortgage, *see In re Cadwell's Corners P'ship*, 174 B.R. 744, 751-52 (Bankr. N.D. Ill. 1994) ("The mortgagor retains title to the mortgaged property until the court enters an order confirming the foreclosure sale and issues the deed, at which time title passes to the mortgagee (assuming that the mortgagee is the purchaser)."); and he also told Kagan that the Property was his home. FOF ¶¶ 70-75, 78. The fact that Linda also exercised dominion and control over the Property does not undermine this conclusion because Jack by all rights co-owns the Property with her.

Four of the five factors weigh strongly in favor of finding that Linda is Jack's nominee. The only factor weighing against that finding, that the quitclaim deed was recorded, is the least significant factor because it is not difficult to record a quitclaim deed. The other factors cannot so easily be manipulated; as this case illustrates, it is difficult to disclaim a close personal

relationship that actually exists, to prove that consideration was paid when none in fact was, to obscure the taxpayer's actual (and, as it turned out, legitimate) fear of creditors, and to pretend that a taxpayer with dominion and control over a property in fact has none. The court therefore concludes that Linda is holding Jack's interest in the Property as a nominee. It follows that the tax liens placed on the Property by the United States are valid.

**Conclusion**

For the foregoing reasons, judgment is entered in favor of the United States and against Linda on Linda's quiet title claim. As for whether the United States can enforce the lien by compelling the Property's sale, the court requests briefing on how the liens should be enforced in light of Linda's interest in the Property as well as the interests held by BANA, MERS, and Freddie Mac. *See generally United States v. Rodgers*, 461 U.S. 677 (1983); *United States v. Davenport*, 103 F.3d 1333 (7th Cir. 1997).

March 31, 2014

_____
United States District Judge